Joseph A. MILES, an Infant, etc.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

William Lee CUMMINGS, an Infant, etc.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. Nos. 3928, 3929.

United States District Court
W. D. Kentucky,
at Louisville.
May 10, 1962.

Ralph H. Logan, Louisville Ky., for plaintiffs.

Wm. E. Scent, U. S. Atty., Louisville, Ky., for defendant.

SHELBOURNE, District Judge.

February 24, 1960, each of the above styled actions was filed in this Court by the infant named in the caption, by his mother acting as next friend, as plaintiff against the United States of America under the Federal Tort Claims Act, Sections 1346(b) and 2671 et seq. of Title 28 United States Code.

The actions arise out of a collision which occurred at the intersection of U. S. Highway 60 (hereinafter referred to as US 60) and Dorsey Lane east of Louisville in Jefferson County, Kentucky. They were consolidated for trial to the Court without the intervention of a jury as required by the Federal Tort Claims Act. The case was heard by the Court on December 5, 1961, and was submitted for judgment as to liability on January 23, 1962. Counsel requested that argument and briefing as to damages be deferred until liability was determined, provided the determination should be in favor of the plaintiffs.

Upon the testimony heard, the depositions read into the record by stipulation, and the exhibits filed, the Court makes the following:

## FINDINGS OF FACT

1. On September 12, 1959, at approximately 9:00 A.M., Joseph Arthur Miles, a minor 15 years of age, and William Lee Cummings, a minor 16 years of age, were traveling west on US 60 on a motor scooter owned by Miles and driven by Cummings en route from Middletown, Kentucky, to the Kentucky State Fair and Exposition Center in Louisville, Kentucky, where the Kentucky State Fair was then in progress. About the same time on that date a United States Army bus driven by PFC Jackie Wall was traveling east on US 60 en route from Fort Knox, Kentucky, to St. Thomas Orphanage located on Dorsey Lane near Anchorage, Kentucky. While the driver of the bus was attempting to make a left turn north into Dorsey Lane at its intersection with US 60, the motor scooter collided with the right side of the bus at or near its rear wheels, resulting in injuries to both Miles and Cummings.

2. The Army vehicle involved in the collision was a 37-passenger '52 Brill bus, approximately 40 feet in length. It was on a mission authorized by the military authorities at Fort Knox, was driven by a soldier stationed at Fort Knox, and carried as passengers two Army sergeants and a group of civilians. All of the passengers on the bus were not available as witnesses at the trial.

3. The vehicle on which Miles and Cummings were traveling at the time of the collision was a Cushman motor scooter equipped with a hand throttle and pedal

brakes; the seat was large enough to accommodate two persons and foot rests were provided for the person riding behind the driver. Immediately before the collision the scooter was traveling at an estimated speed of 35 to 40 miles per hour.

4. On the afternoon of September 11, 1959, Miles drove his motor scooter to the home of Cummings' mother, Mrs. Parricetta Smith, in Jeffersontown, Kentucky. On that occasion Miles explained the operation of the scooter to Cummings and the latter drove it for the first time on the street in front of his home. That evening the two boys attended a football game at Eastern High School, Middletown, Kentucky, where they were both students. According to Miles, after the game they "were out roaming around" in Cummings' car and later parked near Cherokee Park where they slept in the car until morning. He stated that neither he nor Cummings drank any intoxicating beverages during the evening.

On the morning of September 12, 1959, the boys decided to attend the Kentucky State Fair and went to Miles' home for him to get his motor scooter. Miles drove the scooter to Waldman's Gulf Station in Middletown where Cummings left his car. Miles testified that he again explained the operation of the motor scooter to Cummings and they started toward Louisville with Cummings driving it.

5. The testimony of all of the witnesses as to the movements of the bus immediately before the collision is substantially the same.

The bus was traveling east in the outside lane of US 60; as it approached the intersection with Dorsey Lane, the driver moved the bus into the inside lane so that he could make a left turn at the intersection. Because of traffic in the westbound lanes, the driver pulled the bus into the turning lane and stopped. When the westbound vehicles passed the intersection, the driver closed the door of the bus and proceeded slowly across the intersection at a speed not in excess of five miles per hour. It was estimated that it was 20 to 30 seconds from the time the bus began the left turn across the westbound lanes of US 60 until the motor scooter collided with it. At the time of the collision both westbound lanes of the highway were blocked by the body of the bus.

6. There is a rise in the roadway of US 60 on the crest of a small hill at a point identified as Rosedale Park which is located some 750 to 900 feet east of the Dorsey Lane intersection. All testimony is in agreement that there were no obstructions in the westbound lanes of US 60 from the crest of the rise to the intersection at the time the bus driver attempted to make the left turn into Dorsey Lane.

7. Miles testified that when he first saw the bus it was stopped at the intersection and he told Cummings to slow down. He said that it seemed like "it was just a very few seconds" from the time he saw the bus turning left until the motor scooter struck it. When questioned concerning the actual collision, Miles remembered seeing the bus in front of them and a sensation of being thrown forward.

Cummings did not testify at the trial. He was far more seriously injured than Miles and has no recollection of the collision.

8. Wall, driver of the bus, testified that it was his first trip to St. Thomas Orphanage and that he was not familiar with the road; he was unable to recall which of the passengers gave him directions. He estimated that it took 20 to 30 seconds to execute the turn into Dorsey Lane as it was necessary to go slow with "a lumbering piece of equipment like that", referring to the bus. He testified that, although there were no obstructions on the highway between the rise and the intersection, he did not see the motor scooter at any time prior to the collision. He stated that to the best of his knowledge he pulled the bus off the highway after the accident because he wanted to completely clear the highway.

9. Dr. Robert J. McGrath, a resident surgeon at Louisville General Hospital and one of the civilian passengers, was seated midway of the bus in front of the right rear wheels. He testified that while the bus was stopped in the turning lane he observed no traffic in the westbound lanes of US 60; that after the bus started moving across the highway he saw the motor scooter traveling in about the center of the outside lane and then it turned toward the inside lane, apparently in an effort to swerve around the bus. He stated that he watched the scooter from the time it was approximately 50 feet east of the intersection until it struck the right side of the bus at a point a little back of where he was sitting. Dr. McGrath testified that at the time of the collision the seat he was occupying was approximately over the dividing line between the two westbound lanes.

10. Everett Strange, an electrician of Louisville and a civilian passenger, was also seated on the right side of the bus. He testified that he was talking with other passengers and did not observe the motor scooter until someone on the bus yelled, then he looked up and saw it. He stated that the scooter turned to the left and it looked like the driver was trying to stop the scooter but it hit the side of the bus.

11. Paul R. Fauth, a medical technologist at Hazelwood Tuberculosis Hospital, was also a passenger and was sitting in the second or third seat behind the driver on the left side. He testified that from his position he saw the boys on the motor scooter as the bus started to turn left; the scooter was just coming over the rise east of the intersection, and he also saw the top of the car following it. He stated that the bus was too far east for the driver to make a complete, smooth turn into Dorsey Lane; that the driver slowed or practically stopped the bus because of a ditch east of Dorsey Lane, and that about that time the scooter hit the bus. Fauth said he saw the scooter when it was 25 or 30 feet from the bus but did not see it again until after the collision, and he estimated that it was traveling at a speed of 35 or 40 miles per hour.

Fauth testified that in his opinion the accident would not have occurred if the driver had not slowed down or stopped the bus on account of the ditch to the east of Dorsey Lane. Otherwise, the bus would have cleared the highway before the scooter reached the point of impact.

11. Charles Greenlief, a resident of Frankfort, Kentucky, was traveling west in the outside lane of US 60 at a speed of approximately 50 miles per hour. He testified that as he came over the rise he saw the motor scooter less than a block ahead of him, traveling in the same traffic lane, and saw the bus approaching the Dorsey Lane intersection. He stated that his car was approximately 150 yards behind the scooter and he was preparing to pass it when he saw the bus had entered the turning lane, and that he did not pass. He said that his car was approximately 450 feet from the intersection and the scooter was 150 feet in front of him when the bus began to turn across the westbound lanes of US 60, and he estimated that it was "a very few seconds" until the scooter struck the bus. Greenlief said the scooter appeared to slow its speed prior to the collision because his car was still gaining on it in spite of the fact that he was applying the brakes to slow the speed of his car, and that his car was within 20 feet of the scooter when it hit the body of the bus in front of the right rear wheels. At the time of the collision the bus was blocking both westbound lanes of US 60 and Greenlief had to drive his car into the eastbound turning lane to get around the scene of the accident.

Greenlief testified that in his opinion, if his car had been the same distance from the intersection that the motor scooter was at the time the bus started to make the left turn, he could not have stopped his automobile before it hit the bus.

12. The driver of the bus made a left turn from US 60 into Dorsey Lane after the motor scooter approaching the inter-

section from the east was within his sight distance.

13. Either the bus driver failed to maintain the required lookout for traffic approaching the intersection in the west-bound driving lanes of US 60 or he failed to see the motor scooter and the automobile driven by Mr. Greenlief which obviously were within his sight range and which he should have seen.

14. Both boys on the motor scooter were knocked unconscious in the collision and both were taken immediately to Louisville General Hospital.

15. Miles' mother arrived at Louisville General Hospital within an hour after the accident and had him transferred to the Clark County Memorial Hospital at Jeffersonville, Indiana, where he was treated by Dr. George Wolverton and was released two or three days later. As a result of the collision, Miles sustained a broken nose, broken thumb on his left hand, and cuts on his right leg. Miles described the condition of his nose following the accident as "broken off so it was laying against my cheek." In December, 1961, it was necessary for him to undergo surgery to correct the displacement of his nose and enable him to breathe properly. The operation was performed by Dr. George Uhde at Norton Memorial Infirmary in Louisville, Kentucky, where he was hospitalized for seven days. There is no dispute that Miles' total hospital and medical expense amount to $553.85.

16. A different story attends young Cummings. His total medical care, including nurses, up to the time of the trial on December 5, 1961, amounted to $4,975.50. He was confined in the hospital the first time for five weeks and was unconscious for almost three weeks. In the collision Cummings sustained a fracture of the skull and cheek bones, lost his front teeth, and by reason of his traumatic injuries he apparently has become subject to epileptic seizures. His attending physician, Dr. Armand T. Gordon, testified that his mentality has been reduced to that of a six- or seven-year old child and expressed the opinion that there would be no improvement in the future.

Dr. Gordon's testimony and prognosis is offset to some extent by the testimony of Dr. Lovick C. Miller, a psychologist eminently qualified by education, employment and experience, who said that Cummings' intellectual capacity, at the time he examined him approximately two years after the accident, was equivalent to that of an average eighteen-year old boy. Dr. Miller said Cummings could be trained in skills from which he could earn a livelihood. His statement is: "He no doubt has damage but it is relatively specific at this time and could be compensated for if he were properly motivated and trained."

Dr. Richard Roth, an eminent neurologist, examined Cummings on March 30, 1961, at which time he received a history of his injuries, and again on October 17, 1961. Dr. Roth found no complicated malformation traceable to his injuries and testified that Cummings' major deficit was that of his personality. He joined in Dr. Miller's conclusion that counseling, guidance, and education in the future would result in improvement in Cummings' condition.

CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter and of the parties. Sections 1346(b) and 2671 et seq. of Title 28 United States Code.

The bus involved in the accident out of which these actions arose was the property of the United States and at the time of the accident was being operated by a member of the Army in the performance of his official duty and assignment.

Section 189.330(5), Kentucky Revised Statutes, provides:

"The driver of a vehicle shall likewise stop in obedience to a stop sign at an intersection where a stop sign is erected at one or more entrances to the intersection although part of a through highway does not form the intersection. He shall proceed cautiously, yielding to vehicles not so obliged to stop which are within

the intersection or approaching so closely as to constitute an immediate hazard, but may then proceed."

Section 189.380(1), Kentucky Revised Statutes, provides, in part, as follows:

"No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety,. * * *. No person shall so turn any vehicle without giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement."

█ It is the duty of the driver of a motor vehicle desiring to change direction or alter his course to do so only when the change can be made with reasonable safety. The Kentucky statute provides that the vehicle shall not be turned from a direct course on a highway *unless and until* such movement can be made with reasonable safety.

The case of Rankin v. Green, Ky., 346 S.W.2d 477, involved a similar accident. The cars approached an intersection marked by a traffic light from opposite directions; the Rankin car was stopped at the intersection by a red light and when the light changed to green Rankin proceeded to turn left across the street and into the path of the oncoming Green car which had not been required to stop for the red light. The two cars collided within the intersection. The Kentucky Court of Appeals said that it was not a priority to the Rankin car to make the left turn because it had reached the intersection first, and specifically overruled cases in which the Kentucky court had so held. The opinion states:

"Under Walton v. Grant, 302 Ky. 194, 194 S.W.2d 366 and Elliott v. Drury's Adm'x, 304 Ky. 93, 200 S.W. 2d 141, this contention could be upheld. However, in the later cases of Louisville Transit Co. v. Gipe, Ky., 277 S.W.2d 52, and Smith v. Sizemore, Ky., 300 S.W.2d 225, it appear, that this Court has changed its position by holding that priority shall be given to the vehicle proceeding in a straight course. We shall here follow the later cases and thus overrule Walton v. Grant, Elliott v. Drury's Adm'x and other cases with similar holdings."

To the same effect are Weaver v. Brooks, Ky., 350 S.W.2d 639, and Barnes v. Jones, etc., Ky., 351 S.W.2d 506, 507.

Hence, in this instance the motor scooter had prior right because it was proceeding in a straight course and the bus driver should have waited until westbound traffic had cleared the intersection before attempting the left turn. It is obvious that the motor scooter and Greenlief's car were approaching the intersection when the bus driver started his turn.

In Louisville Railway Co. v. Mitchell, 138 Ky. 190, 127 S.W. 770, the Court of Appeals said: "Where the law imposes on a person the duty to see, it will not hear him say that he did not see what he should have seen." This holding has been repeatedly announced in such cases as Roberts v. Rogers, Ky., 265 S.W.2d 448, 449; Vaughn v. Jones, Ky., 257 S. W.2d 583; Brumbach v. Day, Ky., 260 S.W.2d 939, and Kentucky Bus Lines v. Wilson, Ky., 258 S.W.2d 486.

The United States' principal insistence here is that the plaintiffs are precluded from recovery because of contributory negligence. It is contended that Cummings' lack of familiarity with the operation of the motor scooter was the proximate cause of the collision, however, the testimony in the record does not support this contention. As to the fact that Miles and Cummings were both riding on the motor scooter, the Kentucky Court of Appeals has held that three boys riding a motorcycle did not, ipso facto, constitute contributory negligence. Woods v. Jaglowicz, 235 Ky. 637, 32 S.W.2d 1. See also Saxton v. Tucker, 280 Ky. 777, 134 S.W.2d 590, and Harris v. Morris, Ky., 259 S.W.2d 469.

## CONCLUSION

The Court concludes that plaintiff Joseph A. Miles is entitled to recover the

sum of $3,553.85, and that plaintiff William Lee Cummings is entitled to recover the sum of $50,000.00. Judgments so providing will be tendered by counsel for the plaintiffs on notice to the United States Attorney.